S. E. VEST, ADMINISTRATOR OF CHARLIE BLISSCO HEWITT, v. ATLANTIC
COAST LINE RAILROAD COMPANY.

(Filed 10 April, 1935.)

**1. Master and Servant E a—**

Where it is admitted that a railroad employee was killed while engaged
in interstate commerce, the Federal Employers' Liability Act applies in an
action against the railroad to recover for his death.

**2. Master and Servant F c—Contributory negligence and assumption of
risk held to bar recovery in this action to recover for employee's
death.**

The evidence disclosed that plaintiff's intestate, a member of a track
crew engaged in repairing a grade crossing, was working upon a track
adjacent to the track upon which defendant's extra freight train was
approaching at a speed of from thirty-five to forty miles per hour, and
that intestate's back was toward the approaching train, and that the
train whistle was blown about a quarter of a mile away, that the
track was straight and unobstructed, that as it approached the crossing
the train made enough noise to be easily heard, and that as it approached
to within a few feet of intestate, he stepped back from the track where
he was working toward the track upon which the train was approaching,
and was struck and killed by a beam of the engine. There was no evi-
dence that there were distracting noises at the scene of the accident.
*Held:* Defendant's motion as of nonsuit was properly granted.

**3. Same—**

Under the Federal Employers' Liability Act an employee working upon
a live track is charged with knowledge of the conditions and that a train
is likely to be upon the scene at any time.

CLARKSON, J., dissents.

CIVIL ACTION, tried before *Stack, J.,* 30 April, 1934. From MECKLEN-
BURG.

Plaintiff's intestate was a white boy about seventeen years old, al-
though he said he was twenty-one. He was a member of a track repair
crew, consisting of a foreman and five colored men. These track men
were leveling Main Street crossing in Latta, South Carolina. This
work was done by placing screenings under and about the crossties.
On 1 September, 1928, Charlie Hewitt, plaintiff's intestate, was killed by
an extra freight train.

The story of the killing is related by several witnesses. Arthur
Flowers, kinsman of the deceased, testified that he was standing thirty
or thirty-five yards up the street from the track. He said: "I was
standing there talking to Clarence and Homer Carter, two colored boys.
. . . I knew the train was coming because I heard it blow down at
the edge of town and heard the noise of it. I did not hear it blow at

VEST *v.* R. R.

the crossing. I heard it blow north of the depot as it came into town. That is around one-fourth of a mile from the crossing. I also heard the noise of the train. The closer it came to the street crossing the more noise it made. I guess everybody knew the train was coming. It was making enough noise so that people with good ears could have heard it if they had been listening for it. The whole section crew was working on that crossing. . . . All the crew went off on the opposite side except the section foreman and this boy. This boy worked on and the section foreman stayed on the same side the boy was on. I saw all the other hands go to the right-hand side as you look south. . . . The boy was looking south when he was hit and had his back to the train. He was stooped over using the scoop or shovel, looked to be working around the end of the ties. . . . When I heard the train whistle blow it was two crossings down the railroad. I don't know how far it is. . . . Just blowed for the crossing like he was supposed to, and did not blow any more. I was not thinking of whether it was blowing for any other crossing. I didn't have it on my mind. I knew it was coming. The track was perfectly straight. If you had been standing in the middle of the street you could see the train two or three miles. There was no bell ringing. I didn't hear it. I did not have any special reason to listen to the bell." . . .

The foregoing was all the testimony offered by the plaintiff.

The defendant offered the testimony of several witnesses, including the engineer, foreman, and other members of the track crew. The engineer said: "I was on the right-hand side. I could see the section crew. I could not distinguish the boy until I got close to him. They were spreading gravel around the station. All the colored men apparently went over to the north side of the road. This boy was walking along facing west with his back towards the train and just as I got in about three feet of him he made a backward step and the side of my engine hit him there. He had a shovel in his hand. The pilot beam hit him, which is about the average height of a man's hips. . . . I had no idea he was going to step back against my train. He was clear when I saw him just before he made that step. He was about three feet to the right of the pilot beam before he made that backward step. The train had moved 25 or 30 feet since it stopped blowing. . . . I quit blowing when I was in 25 or 30 feet of it. . . . He was about the same distance from the track all the time, working on the sidetrack south with his back to the track my train was on." In response to a question by the court, the engineer further said: "When I first saw the boy he was on the sidetrack, sprinkling dirt on the sidetrack up between the two, just stepped back three feet." The engineer further said: "He was not on my track. We would have cleared him all right if he had not stepped back. His back was three feet from my track."

McLaurin, foreman, testified that at the time of the killing the track crew, consisting of six men, including the deceased, was leveling up Main Street with screenings while filling up holes in order to make smooth crossings for automobiles. He said: "I called the attention of the hands to the train coming, told them to clear the track. At the time I told them to clear that track, some were on the sidetrack, some on the main line southbound track, and I told them to clear the northbound track, to get out of the way. All the darkies cleared the northbound track and Hewitt and myself stayed over to the right of the southbound track next to the passenger station. . . . When I called to him and told him to let's clear the track he said, 'All right, captain, coming.' I walked up to the edge of the yard of the passenger station. From the time I gave him notice I walked 20 or 30 feet. . . . I was looking at the approaching train. . . . After I turned my face around where I could see him before he was hit was one second, maybe. As I was looking the train hit him. . . . I stopped him from working when the train got some distance from us. I told him to clear the track. He quit working when I told him to quit. He must have started back to work."

The telegraph operator testified that he heard signals and the notice given by the foreman to the workmen near the track.

The defendant offered the testimony of three or four witnesses, including members of the track crew, who testified to the effect that the track was straight, that signals were given by the engineer both by bell and whistle, and that the foreman gave due notice to the workmen to clear the track.

The witness Flowers was recalled and said: "Just before he was struck Charles Hewitt was working, it looked like, sideways. He stayed about the same distance from the track."

It was admitted that plaintiff's intestate at the time of his death was engaged in interstate commerce.

At the conclusion of all the evidence the trial judge sustained a motion of nonsuit, and the plaintiff appealed.

*John M. Robinson and Hunter M. Jones for plaintiff.*
*Cansler & Cansler for defendant.*

BROGDEN, J. A young white man is employed by a railroad as a member of a track crew, and is engaged in leveling the track at a street crossing in a town in South Carolina. He had been engaged in work for two or three months. While so engaged, an extra freight train approaches in the daytime, traveling at a speed of thirty-five or forty miles an hour. The workman has his back to the train and is apparently scattering screenings or gravel about the end of the crossties.

All other workmen in the squad leave the track in safety, but the deceased remains and is struck in the back by a beam of the engine and killed. At the point of the killing the track is "perfectly straight" for a distance of some three to seven miles, and there are no obstructions to the vision of an employee. At the trial practically all of the witnesses for the defendant assert that signals were given both by whistle and bell. A witness for the plaintiff testified that the whistle was blown about a quarter of a mile from the place of the killing and not thereafter, but that he "heard the noise of the train, the closer it came to the street crossing the more noise it made. I guess everybody knew the train was coming. It was· making enough noise so that people with good ears could have heard it if they had been listening for it."

Upon the foregoing facts the sole question of law involved is the correctness of the judgment of nonsuit.

Obviously this question must be solved by application of the principles of law held and promulgated by the Federal courts. Apparently the leading decisions of the Supreme Court of the United States on the subject are *Aerkfetz v. Humphreys,* 36 Law. Ed., 758; *Chesapeake & Ohio R. Co. v. Nixon,* 271 U. S., 218, 70 Law Ed., 914; *Rocco v. Lehigh Valley R. R. Co.,* 288 U. S., 275, 77 Law Ed., 743. See, also, *Biernacker v. Penn. R. R.,* 45 Fed. (2d), 677, and *S. A. L. R. Co. v. Horton,* 233 U. S., 492, 58 Law Ed., 1062. In the *Nixon case, supra,* the deceased was riding a railroad velocipede in returning home from his work. He was run down and killed by a train traveling in the same direction as the velocipede. It seems that the engineer and fireman were not keeping a lookout. The Court, speaking through *Mr. Justice Holmes,* said: "If the accident had happened an hour later when the deceased was inspecting the track, we think there is no doubt that he would be held to have assumed the risk, and to have understood, as he instructed his men, that he must rely upon his own watchfulness and keep out of the way. The railroad company was entitled to expect that self-protection from its employees."

The *Rocco case, supra,* presents a different aspect of the question. In that case the track inspector was using a railroad tricycle in the course of his duties, and was killed by a head-on collision with a passenger train. The killing occurred "on a blind curve," where the deceased "could not see the approaching train nor the motorman see him." *Mr. Justice Roberts* wrote as follows: "Respondent relies on the duty of a person employed on the tracks of a railroad to exercise vigilance for his own safety, and to keep out of the way of moving trains, and asserts that the chance of a collision was a risk assumed by an employee assigned to work on the roadbed. *Aerkfetz v. Humphreys,* 145 U. S., 418, 36 Law Ed., 758, 12 S. Ct., 835; *Chesapeake & Ohio R. Co. v. Nixon,*

271 U. S., 218, 70 L. Ed., 914, 46 S. Ct., 495. Those cases applied the principle to accidents on a stretch of tracks where the workman's view was unobscured. Here, according to the proof, the curve on which the collision occurred, and obstructions at the side of the roadway, prevented any but a very short view of the track ahead. We think these facts required that the jury should determine whether the motorman exercised reasonable care to have his train under control, to sound a warning before entering the curve, and to be on the lookout for workmen whose presence might be expected on the day in question, when the waters of the lake were washing over the tracks at this point and inspection and repair might be required. Under the authorities cited the decedent assumed the risks ordinarily incident to his employment as a track inspector, but in the circumstances shown, we do not think they included a failure on the part of the motorman to keep a lookout and to give warning in places where the view of one who might be expected to be on the track or approaching in the opposite direction was shut off and the probability of accident was therefore much greater than where the track is straight and the view unobstructed."

*Judge Hand,* in the *Biernacker case, supra,* rests the decision of the Court upon the *Nixon case, supra.* He declared: "Finally, it is not clear that even if the custom should be construed as imposing a duty upon the crews to keep a lookout for trackmen, the intestate did not assume the risk of their neglect. Under the Employers' Liability Act (45 U. S. C. A., secs. 51-59), it is not true that an employee never assumes the risk of his employer's negligence. . . . If the dangers be apparent and known, they are assumed; so far as this may differ from the common law, if at all, the statute prevails." The Supreme Court of the United States on April 20, 1931, denied a petition for *certiorari* to review the foregoing case. See 283 U. S., 840, 75 Law Ed., 1451.

The plaintiff relies upon *Reed v. Director-General,* 258 U. S., 92, 66 Law Ed., 480, and the cases of *Brown v. R. R.,* 144 N. C., 634, 57 S. E., 397; *Moore v. R. R.,* 185 N. C., 189, 116 S. E., 409; and *Moore v. R. R.,* 186 N. C., 257, 119 S. E., 357. See, also, 71 A. L. R., 461. The *Brown case, supra,* apparently did not involve the Employers' Liability Act. *Moore v. R. R.,* 186 N. C., 257, did involve the application of said act. However, the principle of liability invoked in the *Moore case, supra,* rested ultimately upon the theory that the engineer of the train could see that the deceased was deeply engrossed in his work and wholly oblivious of approaching danger, and that such information was available to the engineer in time to have stopped the train before killing plaintiff's intestate.

The Court is of the opinion that the cases relied upon by the plaintiff are not controlling and decisive. The evidence offered in behalf of the

plaintiff disclosed that a signal had been given about a quarter of a mile from the point of injury, and that, although no other signal was heard, "everybody knew the train was coming. It was making enough noise so that people with good ears could have heard it if they had been listening for it." Consequently, full notice of the approaching train was available to plaintiff's intestate. All other members of the crew were fully appraised of the danger and moved off the track into a place of safety.

The evidence for plaintiff further disclosed that at the time of the impact the deceased "looked to be working around the end of the ties." Obviously, he was not working upon the track at the time he was killed. Although he was not a foreman or an experienced workman, nevertheless he was charged with notice that he was working upon a live track, and that a train was likely to be upon the scene at any time. His vision was unobstructed for at least three miles, and there was no evidence of noises or other traffic movements about the scene calculated to divert his attention or to prevent him from hearing the noise of the approaching train.

Therefore, the Court is of the opinion that the ruling of the trial judge was correct.

Affirmed.

CLARKSON, J., dissents.